COURT OF APPEALS
DECISION
DATED AND FILED

June 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1387**

Cir. Ct. No. **2022CV199**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

RICHARD SCHNEITER,

   PLAINTIFF-APPELLANT,

 V.

WISCONSIN EMPLOYMENT RELATIONS COMMISSION AND
KEVIN CARR, SECRETARY WISCONSIN DEPARTMENT OF CORRECTIONS,

   DEFENDANTS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Columbia County: TROY D. CROSS, Judge. *Affirmed*.

Before Kloppenburg, P.J., Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Richard Schneiter was discharged from his position as a deputy warden at the Wisconsin Department of Corrections (the Department) after it was widely publicized that he had posted memes denigrating Muslims on his Facebook page.   The Wisconsin Employment Relations Commission (the Commission), after an administrative hearing, affirmed the Department's decision to discharge Schneiter.  Schneiter sought judicial review of the Commission's decision, and the circuit court ruled in favor of the Commission and then-Department Secretary Kevin Carr (collectively, the respondents) and affirmed.  Schneiter appeals, arguing that there was not just cause to discharge him without imposing progressive discipline and that he was denied due process.  For the reasons stated below, we affirm.

## BACKGROUND

¶2     The following undisputed facts are derived from the evidence presented at the hearing before a Commission hearing examiner, unless otherwise noted.

¶3     Schneiter was the deputy warden for the Wisconsin Correctional Center System (the Correctional Center System), which is part of the Department's Division of Adult Institutions.  The Correctional Center System is a network of 14 minimum-security facilities located across Wisconsin, the purpose of which is "to prepare persons in [its] care … for safe and successful reintegration into the community."[1]   Schneiter had worked at the Department for 42 years,

---

[1] STATE OF WIS. DEP'T OF CORR., *Wisconsin Correctional Center System*, https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/WisconsinCorrectionalCenterSystem.aspx  (last visited June 23, 2025).

during which time he held several other positions prior to serving as deputy warden for the Correctional Center System.

¶4    As deputy warden, Schneiter was required to visit Department facilities and was responsible for supervising, hiring, training, evaluating, and disciplining employees, as well as settling employee grievances. Schneiter was also responsible for acting as a liaison between the Department and legislators, government officials, and external organizations, and he was responsible for ensuring compliance with Department policies, including those regarding civil rights laws. This last duty included "[p]articipat[ing] in developing a plan to maximize use of resources to recruit minority staff," as well as "[e]stablish[ing] expectations that will not tolerate prejudices, unfairness and harassment among staff or between staff and inmates."

¶5    During the relevant period, Department leadership sought as part of its mission to focus on equity and inclusion. The "tag line" for the Department's vision statement was "Every Person – Every Family – Every Community Matters." In his role as deputy warden, Schneiter was responsible for implementing the Department's vision, mission, and core values, and Schneiter served as a role model for those he supervised. Schneiter supervised a diverse workplace that included, as relevant here, Muslim employees. Additionally, while Schneiter was deputy warden, the Department had a diverse prison population, which included Muslim inmates.

¶6    In July 2019, a reporter from the *Milwaukee Journal Sentinel* contacted Schneiter. The reporter had obtained screenshots from one of Schneiter's Facebook friends of five memes that Schneiter had reposted on his

Facebook page.[2]  The two memes on which the Commission ultimately based its decision are shown below:



These memes were visible to Schneiter's more than 1,200 Facebook friends, many of whom were past or present Department employees.

¶7	Schneiter responded to the reporter using his Department email account and spoke to the reporter on the telephone without authorization from his superiors.  That same day, the *Milwaukee Journal Sentinel* published an article titled, "Deputy prison warden posts Facebook meme that compares Muslim children to garbage."  The article included a screenshot of the meme described in

---

[2]  A "meme" is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Meme*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/meme (last visited June 23, 2025).

the article's title and quoted Schneiter as saying, "That's not funny. If anything, it's very offensive. But this is the type of stuff you see on Facebook. But it starts discussion, which I try — which, I guess, that's what I do." The article also reported that "Schneiter said his posts were being misinterpreted and he only wanted to engage in discussions on controversial issues." After the article was published, then-Lieutenant Governor Mandela Barnes posted on social media that Schneiter was "the one that has to be taken out. Too much of our nation's system of corrections is based on dehumanization. To add bigotry to the mix is dangerous and cannot be tolerated."

¶8    The day after the article was published, the Department initiated an investigation into Schneiter's conduct, and Makda Fessahaye, the Division of Adult Institution's then-administrator, placed Schneiter on paid administrative leave. Fessahaye assigned two investigators, who reviewed the screenshots of Schneiter's posts and who interviewed Schneiter, Schneiter's direct supervisor, and two Department employees who were friends with Schneiter on Facebook.

¶9    The investigators concluded in an investigation report that Schneiter had violated several workplaces rules. Pertinent here, the investigators concluded that Schneiter violated Work Rule 25, which prohibits "[e]ngaging in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state."[3]

---

[3] The investigators also concluded that Schneiter violated Work Rule 2—which requires employees to comply with written policies and procedures—by violating the Department's media policy when he responded to the *Milwaukee Journal Sentinel* reporter, and that Schneiter violated Work Rule 14, which prohibits "[i]ntimidating, interfering with, harassing, demeaning, treating discourteously, or bullying; or using profane or abusive language in dealing with others." However, the Commission affirmed the Department's discharge of Schneiter based on Schneiter's violation of Work Rule 25 without addressing whether Schneiter violated Work Rules 2 and 14.

¶10 An infraction review team reviewed the investigation report and agreed with the investigators' conclusions, and a "predisciplinary meeting" took place, at which Schneiter had the opportunity to provide mitigating evidence, and at which Schneiter and his personal representative provided statements.

¶11 Following the predisciplinary meeting, a disciplinary action review team reviewed the investigation report and, after considering the investigation and the proceedings at the predisciplinary meeting, recommended that Schneiter be discharged without imposing progressive discipline. The recommendation to skip progressive discipline was made pursuant to the Department's Executive Directive 2, which states that employees may be discharged without progressive discipline for "serious acts of misconduct." This includes "[g]ross negligence or conduct by an employee which causes a substantial risk to the safety and security of [the Department's] facilities, staff, the community or inmates, offenders or juvenile offenders under [the Department's] care."

¶12 The recommendation was ultimately considered by the Department's Office of the Secretary. After a meeting that included Department Secretary Karr and Deputy Secretary Amy Pechacek, the Office of the Secretary supported the recommendation to discharge Schneiter without progressive discipline.

¶13 In November 2019, the Department issued a termination letter, signed by Pechacek. The letter stated, consistent with what the Department's investigators concluded, that Schneiter had violated Work Rule 25.[4] The letter stated, among other things, that Schneiter's posts cast doubt on his ability to lead,

---

[4] The letter also stated that Schneiter had violated Work Rules 2 and 14.

"eliminated [Schneiter's] ability to act as a role model and as a supervisor," could have interfered with the Department's recruitment efforts, "diminished the Department's and the public's ability to trust that [Schneiter was] able to perform the duties of [his] position," and "create[d] safety concerns" at Department institutions.

¶14 Schneiter unsuccessfully challenged the Department's decision through a grievance process for state employees before appealing to the Commission. A hearing examiner held a two-day hearing at which Schneiter was represented by counsel. The Department called six witnesses, including Schneiter, Fessahaye, Pechacek, and one of the investigators assigned to the Department's investigation.

¶15 Schneiter did not call any witnesses at the hearing, but was called adversely by the Department. Schneiter testified that he posted political content to his Facebook page because "sometimes you can learn a lot from debates, and that was my intent, to promote debate or to continue a debate or to provide my opinion." Regarding the meme with the photo of the Muslim woman and two bags of garbage, Schneiter described it as "offensive and demeaning to Muslims," and explained that he posted it to call attention to what he viewed as Facebook's inconsistent content moderation policies. Schneiter testified that his intent in posting the "Bacon America Great Again" meme, which he described as "inappropriate," "was the same." Schneiter testified that comments to his posts would have reflected his intent and shown that the memes did not represent his personal beliefs, but that the screenshots of his posts that were published in the article did not contain these comments.

¶16   The hearing examiner issued a proposed decision affirming Schneiter's discharge, to which Schneiter filed an objection. *See* WIS. STAT. § 227.46(2) (2023-24) (allowing for such an objection).[5]

¶17   The Commission issued a final decision and order and accompanying memorandum that affirmed Schneiter's discharge.   The Commission relied on the two memes shown above that denigrated Muslims, and on Schneiter's admission that these memes were offensive.   The Commission found that any of Schneiter's Facebook friends, including several coworkers, could see Schneiter's posts of the memes.   The Commission also found that "Schneiter had an unauthorized conversation with a member of the media," and that on the same day, "a front-page story ran in the *Milwaukee Journal Sentinel* with the headline 'Deputy prison Warden posts Facebook meme that compares Muslim children to garbage.'"

¶18   Tracking the language from Work Rule 25, the Commission determined that "Schneiter engaged in outside activities which may impair the employee's independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state."   The Commission also determined—tracking language from Executive Directive 2, which allows discharge without imposing progressive discipline—that "Schneiter was grossly negligent and engaged in conduct which causes a substantial risk to the safety and security of Department … facilities, staff, the community or inmates, offenders or juvenile offenders."   Accordingly, the Commission concluded that the Department had just cause to discharge Schneiter under WIS. STAT. § 230.34(1)(a) without imposing

---

[5]  All references to the Wisconsin Statutes are to the 2023-24 version.

progressive discipline. We discuss the Commission's decision in further detail below.

¶19 Schneiter sought judicial review of the Commission's decision. The circuit court affirmed. Schneiter appeals.

## DISCUSSION

¶20 Schneiter argues that there was not just cause to discharge him without imposing progressive discipline. Schneiter also argues that he was denied due process because he did not have notice that Work Rule 25 applied to his social media use, the statement that then-Lieutenant Governor Mandela Barnes made on social media after the *Milwaukee Journal Sentinel* article was published improperly influenced the Department's decision to discharge Schneiter, and the hearing examiner was biased. We reject these arguments for the reasons that follow.

*I. Just cause for discharge without progressive discipline.*

¶21 WISCONSIN STAT. § 230.34(1)(a) states:

> An employee with permanent status in class … may be … discharged … only for just cause. It is just cause to … discharge … an employee for work performance or personal conduct that is inadequate, unsuitable, or inferior, as determined by the appointing authority, but only after imposing progressive discipline that complies with the administrator's standards under [WIS. STAT. §] 230.04(13m).

Pursuant to § 230.04(13m), the administrator of the Department of Administration, Division of Personnel Management

> shall establish standards for progressive discipline plans to be prepared by all agencies and applied to all employees in the classified service. The standards shall address

> progressive discipline for personal conduct and work performance that is inadequate, unsuitable, or inferior. The standards established under this subsection shall allow an appointing authority to accelerate progressive discipline if the inadequacy, unsuitability, or inferiority of the personal conduct or work performance for which an employee is being disciplined is severe.

The progressive discipline standards are set forth in the Wisconsin Human Resources Handbook, which states that "[s]pecific agency policies and procedures may escalate the level of progression up to and including termination." Here, as stated, Schneiter was discharged without progressive discipline for violating Work Rule 25 and pursuant to the Department's Executive Directive 2, which states that employees may be discharged without progressive discipline for "serious acts of misconduct," including, as the Commission relied on here, "[g]ross negligence or conduct … which causes substantial risk to the safety and security of [the Department's] facilities, staff, the community or inmates, offenders or juvenile offenders under [the Department's] care." It is the appointing authority's burden—here, the Department's—to prove that just cause exists to discharge the employee without imposing progressive discipline. *See Safransky v. State Pers. Bd.*, 62 Wis. 2d 464, 472, 215 N.W.2d 379 (1974).

¶22 Schneiter argues that there was not just cause to discharge him without imposing progressive discipline. Specifically, he argues that there was not substantial evidence to support the Commission's finding that he violated Work Rule 25 or that his conduct was grossly negligent or a substantial safety and

security risk such that the Department could discharge him pursuant to Executive Directive 2 without imposing progressive discipline.[6]

¶23    When reviewing an agency's findings of fact, we will "not substitute [our] judgment for that of the agency as to the weight of the evidence on any disputed finding of fact," and we will only "set aside [the] agency action or remand the case to the agency if [we] find[] that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." WIS. STAT. § 227.57(6).  "The test is not whether a preponderance of the evidence supports …[the Commission]'s determination, but whether reasonable minds could arrive at the same conclusion reached by the [Commission]."  ***Madison Tchrs., Inc. v. WERC***, 218 Wis. 2d 75, 85, 580 N.W.2d 375 (Ct. App. 1998); *see also **Clean Wis., Inc. v. PSC***, 2005 WI 93, ¶46, 282 Wis. 2d 250, 700 N.W.2d 768 ("An agency's findings are supported by substantial evidence if a reasonable person could arrive at the same conclusion as the agency, taking into account all the evidence in the record."); ***Bernhardt v. LIRC***, 207 Wis. 2d 292, 298, 558 N.W.2d 874 (Ct. App. 1996) ("Substantial evidence is less of a burden than preponderance of the evidence …").  Our role is to search the record for evidence supporting the agency's factual determinations, "not to search for evidence against them."  ***Robles v. Thomas Hribar Truck & Equip., Inc.***, 2020 WI App 74, ¶8, 394 Wis. 2d 761, 951 N.W.2d 853.

---

[6] The parties do not dispute that these determinations are subject to the substantial evidence test.  Schneiter treats these determinations as findings of fact, and we accordingly do the same.

## A. *Substantial evidence supports the Commission's finding that Schneiter violated Work Rule 25.*

¶24 As noted, the Commission found that Schneiter violated Work Rule 25, which prohibits "[e]ngaging in outside activities which may impair the employee['s] independence of judgment or impair the employee's ability to perform his/her duties as an employee of the state." Schneiter argues that the finding that he violated Work Rule 25 is not supported by substantial evidence in the record. For the reasons explained below, we conclude that substantial evidence supports this finding.

¶25 In finding that Schneiter violated Work Rule 25, the Commission relied on the testimony of Fessahaye and Pechacek. Fessahaye's testimony included the following. Fessahaye was responsible for the oversight and management of the adult state prisons. In executing the Governor's campaign platform, the Department "had a focus of equity and inclusion, treating others with dignity and respect, and really trying to recruit … a talented and diverse workforce for the Department." Consistent with these goals, the "tag line" for the Department's vision was "Every Person – Every Family – Every Community Matters." The Correctional Center System had a diverse work force, and Schneiter supervised a diverse group of employees, including those who were Muslim.

¶26 As a deputy warden, Schneiter was in a "career executive position," was a "high-level official," and was held to a higher standard than correctional officers or entry-level employees:

> We did hold Mr. Schneiter and deputy wardens to a higher standard than correctional officers and entry level employees, in part because, especially as a deputy warden, they were responsible for day-to-day operations at

> particular prisons and they were responsible for enforcing certain policies, procedures, and carrying out the mission and values of the [Department].

Pursuant to the Department's harassment and discrimination policy, part of Schneiter's job responsibilities was to take seriously complaints and allegations regarding violations of this policy—which might include jokes, epithets, slurs, and negative stereotyping—and to intervene when violative conduct was observed.

¶27 Fessahaye believed that it was appropriate to discharge Schneiter because:

> I thought that Mr. Schneiter's actions … poorly reflected on the [Department]. I thought that his actions could interfere with our mission, goals, and values, if not undermine them, that it interfered with the public trust in the [Department] and our relationships with members of the community and organizations that we work with.
>
> I thought that his actions could have compromised safety and security at institutions if they believed that these were the statements or sentiments of the [Department].
>
> I thought that … by posting this, it really impaired his ability to lead as a high-level employee within the [Department] and that it really cast doubt as to his ability to treat others with respect, dignity, fairness, impartiality.
>
> … [H]e's responsible for enforcing policies and procedures for the [Department] and really holding up our mission, values, and goals of the [D]epartment and he effectively stomped on all of them when he posted what he did.
>
> And I also considered the amount of friends he had on his Facebook, how many of those were [Department] employees, subordinates of his, and what he publicly admitted to the *Milwaukee Journal Sentinel*.

In addition, the Department has

> an obligation to the public and they trust that we are treating people with dignity and respect and that is something that we say and try to uphold on a daily basis.

13

> And so these posts undermine our mission, values, and goals. It also undermines our ability to recruit from a diverse workforce from all over the state of Wisconsin and to work with diverse communities that are ultimately trying to assist us in caring for persons in our care.

¶28 Pechacek testified that she was "basically the chief operations officer, so in charge of the day-to-day operations of 37 facilities, 134 field offices, … approximately 22,000 persons in [the Department's] care, 66,000 individuals who were on community supervision," as well as "the annual budget, which … was about [$]1.2 billion, and … daily operations, policies, procedures, and implementing the vision of Secretary Karr."

¶29 Pechacek's testimony also included the following. The Department's "motto" was "Every Person – Every Family – Every Community Matters," and "the mission of the [Department] is ensuring the safety of the persons in [the Department's] care, the safety of the public, and is focused on rehabilitation and supporting those folks that are reintegrating into the community and setting them up for success." Like Fessahaye, Pechacek testified that Schneiter was held to a higher standard because of his position:

> So as an employee, he is expected to follow all the policies and procedures…. And then as somebody in a career executive position, he's in a leadership position.
>
> You know, as an employee alone he is held accountable for the example that he [sets], but certainly in a senior leadership position managing 14 facilities and having direct reports and being in charge of the operations of 14 different facilities, he is held to a very high standard as a career executive.

¶30 Relevant to Schneiter's ability to implement the Department's vision, mission, and core values, Schneiter's posts were harmful to the Department:

14

> So having a senior leader communicate beliefs that are disparaging, discriminatory, harassing, demeaning, such as this one where Muslim children are being compared to garbage bags, certainly impacts anybody who is in our care or employed by the [Department] or are partners with the [Department] that may identify with these particular groups.

Schneiter's posts damaged the Department's credibility: "Again, by communicating discriminatory beliefs, mocking children and comparing them to garbage, … this is completely against the mission and the vision and the values of the [Department] and our goal to be equitable and fair."

¶31 Schneiter "had undermined the mission of the agency, and his ability to lead in an equitable and fair manner was questioned." Schneiter's posts and their publicity adversely affected his ability to perform his supervisory duties relating to discrimination and harassment complaints: "If somebody is posting material that describes beliefs … which … compares Muslim children to garbage bags, they are not going to be somebody who can fairly represent and equitably treat individuals that identify with th[at] class[]." In addition, "supervisors are expected to take all complaints and allegations seriously…. And it is hard to imagine somebody who is comparing Muslim children to garbage bags, that if somebody brought forward a discriminatory complaint to him about their religious beliefs, that he has the judgment or credibility to conduct himself in a supervisory manner."

¶32 The testimony of Fessahaye and Pechacek was consistent with the rationale for terminating Schneiter that was stated in his termination letter, which the Commission also relied on when concluding that Schneiter's conduct impaired his ability to perform his duties as deputy warden. The termination letter states:

> Den[i]gration of … Muslims … casts public doubt about your ability to lead, casts public doubt about your

ability to treat inmates, staff, and members of the public fairly and impartially, sows discord and divisiveness, and sets a poor example.

The effectiveness of the [Department] depends, in part, on the respect and trust of the public, its employees, and the offenders it supervises, that the [Department] will conduct its affairs fairly, even-handedly, and without bias. Your postings are of a nature that tends to have a detrimental effect on establishing and maintaining strong working relationships within a diverse workforce and with diverse community partnerships. These postings could additionally potentially interfere with [Department] recruitment. Your postings – which were shared with approximately 1,200 Facebook friends, many of whom are [Department] employees, eliminated your ability to act as a role model and as a supervisor. Any supervisory actions you may take are now suspect.

The [Department's] rehabilitative mission may also be impaired when inmates become aware of apparent … religious … animus on the part of [Department] employees. Inmates may assume that the [Department]'s actions are a product of bias, rather than well-founded and in pursuit of its mission. Expression of animus of this nature additionally creates safety concerns in the institutions.

¶33 A reasonable person, taking into account all of the evidence in the record, could conclude, based on Fessahaye's and Pechacek's testimony, which was consistent with the rationale stated in Schneiter's termination letter, that Schneiter's posts and their publicity impaired Schneiter's ability to perform his duties by interfering with Schneiter's ability to lead a diverse staff and to effectively advance the Department's mission and goals, including its recruitment efforts, its rehabilitative efforts, and its ability to establish and maintain community partnerships.

¶34 Accordingly, we conclude that substantial evidence supports the Commission's determination that Schneiter violated Work Rule 25. We reject Schneiter's arguments to the contrary.

16

¶35    Schneiter argues that his conduct did not keep him from performing his job responsibilities and that the Commission did not find as much.  However, to the extent that Schneiter means to suggest that his work was not affected after his posts were publicized in the article, we note that Schneiter was placed on administrative leave the day after the article was published.  Moreover, Work Rule 25 prohibits employees from "[e]ngaging in any outside activities … which *may* impair … the employee's ability to perform his/her duties …."  (Emphasis added.)  As the federal District Court for the Western District of Wisconsin stated in addressing Schneiter's same argument in the context of a First Amendment claim, "Schneiter's posts threatened relationships with many different groups of people, and the potential consequences of allowing Schneiter to continue representing the [D]epartment were serious.  Defendants 'need not wait until a riot breaks out before acting to quell a dangerous situation.'"  *Schneiter v. Carr*, No. 21-CV-135-JDP, 2022 WL 1773484, at 18 (W.D. Wis. June 1, 2022) (quoting *Weicherding v. Riegel*, 160 F.3d 1139, 1143 (7th Cir. 1998)); *see also Weicherding*, 160 F.3d at 1143 ("The Supreme Court has 'consistently given greater deference to government predictions of harm' when the government acts as an employer instead of as a sovereign, and has 'given substantial weight to government employers' reasonable predictions of disruption, even where the speech involved a matter of public concern[.]'" (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994))); *Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

¶36    Schneiter also appears to argue that there was not substantial evidence that he violated Work Rule 25 because he posted the memes "to raise

awareness of Facebook's ridiculous content policies." As he testified to at the hearing, Schneiter suggests on appeal that comments posted in response to the memes would reflect this claimed intent. However, aside from his own testimony, Schneiter did not present any evidence during the hearing or the Department's investigation to show that his intent was to call attention to Facebook's content moderation policies. For example, Schneiter did not present as evidence the relevant comments or call as a witness any of his more than 1,200 Facebook friends to testify regarding these comments, and he does not dispute that he deleted the posts that he asserts would have shown such an intent. More fundamentally, Schneiter does not develop an argument as to the legal significance of his claimed intent, and we reject Schneiter's apparent argument on that basis. *See* ***Clean Wis.***, 282 Wis. 2d 250, ¶180 n.40 ("We will not address undeveloped arguments.").

¶37 In sum on this issue, we conclude that substantial evidence supports the Commission's finding that Schneiter violated Work Rule 25.

> *B. Substantial evidence supports the Commission's finding that Schneiter's conduct was grossly negligent and a substantial safety and security risk such that the Department could discharge him pursuant to Executive Directive 2 without imposing progressive discipline.*

¶38 As stated, the Commission determined that discharge without progressive discipline was appropriate pursuant to Executive Directive 2, which states that employees may be discharged without progressive discipline for "serious acts of misconduct," including, as the Commission relied on here, "[g]ross negligence or conduct … which causes substantial risk to the safety and security of [the Department's] facilities, staff, the community or inmates, offenders or juvenile offenders under [the Department's] care." Specifically, the

Commission found that "Schneiter was grossly negligent and engaged in conduct which causes a substantial risk to the safety and security of [Department] facilities, staff, the community or inmates, offenders or juvenile offenders."

¶39    Schneiter argues that the Department did not have just cause to discharge him without imposing progressive discipline because his conduct did not constitute gross negligence or cause a substantial safety or security risk.  We construe this as an argument that the Commission's findings to the contrary are not supported by substantial evidence.  Notably, Schneiter does not dispute that if his conduct did constitute gross negligence or cause a substantial safety and security risk, it also constituted just cause to discharge him without first imposing progressive discipline.  Thus, we limit our discussion to whether substantial evidence supports the Commission's finding that Schneiter's conduct was grossly negligent and caused a substantial safety and security risk.  For the reasons explained below, we conclude that it does.

¶40    In finding that Schneiter's conduct was grossly negligent and created a substantial safety and security risk, the Commission again relied on the testimony of Fessahaye and Pechacek.  We conclude that this testimony provides substantial evidence supporting the Commission's findings.

¶41    In addition to the testimony set forth above, Fessahaye testified that she believed that Schneiter's actions constituted a serious act of misconduct that justified terminating Schneiter without imposing progressive discipline because:

> I thought that these posts were negligent.  As a high-level official in his role as deputy warden, I thought these were reckless and that they could have posed a serious risk not only to [Schneiter] but to others within the [D]epartment if they believed that these were the views of the [Department] and our staff.

19

Consistent with this, Fessahaye testified that prisoners had access to the *Milwaukee Journal Sentinel* and that one of the reasons that Schneiter was placed on administrative leave while the Department's investigation was pending was that his safety could have been at risk "should he visit institutions." As previously noted, visiting institutions was part of Schneiter's job duties.

¶42 Pechacek testified that she was provided with information regarding assaults at Department institutions during weekly meetings, and that there were "daily, weekly assaults." Pechacek also testified that as a result of Schneiter's posts, she was concerned for Schneiter's safety and the safety of others:

> [C]ommunicating beliefs such as those in [Schneiter's posts] creates animosity and climate issues for the individuals in our care that identify with these various groups that are being disparaged in this communication. And, you know, in the atmosphere, in the climate, in the environment in a facility, in a prison, it's already dangerous without creating additional life/safety risks and animosity and the belief that individuals are treated differently based on … their religion ….
>
> So all of those things create continued and accelerated risks not only for the individual that is distributing and displaying these inappropriate screen grabs and memes but it reflects on all of the leadership and all of the employees of the agency given the fact that Mr. Schneiter is a deputy warden. So it's just a powder keg.

In further explaining why Schneiter's conduct warranted his discharge, Pechacek testified, "The factors that we considered were the life, safety, and climate risks throughout the agency and at the 37 facilities, the impact this would have if he remained at [the Department], [and] his credibility with not only our employees but the public to carry out our mission."

¶43    This testimony, along with the testimony set forth in the prior section, is substantial evidence that supports the Commission's findings: based on this testimony, a reasonable person could conclude that Schneiter's conduct was grossly negligent and caused a substantial risk to the safety and security at the Department.[7]

## II. *Due process.*

¶44    "An employee who may be dismissed only for 'just cause' has a property interest in continued employment which is protected by the due process clause of the federal constitution." *Arneson v. Jezwinski*, 225 Wis. 2d 371, 393, 592 N.W.2d 606 (1999); *see also* *Thorp v. Town of Lebanon*, 2000 WI 60, ¶35 n.11, 235 Wis. 2d 610, 612 N.W.2d 59 ("[O]rdinarily there is no discernible difference in intent between the … Due Process Clauses under the Wisconsin Constitution and the United States Constitution."). Schneiter argues that he was

---

[7] Schneiter also asserts that to be discharged without imposing progressive discipline, the requisite serious act of misconduct must have occurred while Schneiter was on duty. However, Schneiter does not cite to any legal authority in support of this assertion. *See* *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered."). Although we could reject Schneiter's argument on that basis alone, as the respondents point out in their response brief, Executive Directive 2 explicitly states that it applies to precisely the type of off-duty misconduct at issue here: it states, "Work rules apply to on-duty misconduct or off-duty misconduct that adversely affects the ability of either the Department to carry out its mission or an employee to perform his or her duties and responsibilities." Schneiter does not respond to this argument in his reply brief, thereby conceding the point. *See* *United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (failure by appellant to respond in reply brief to an argument made in respondent's brief may be taken as a concession).

Separately, Schneiter argues that gross negligence or conduct creating a substantial safety risk could not be a basis for discharging him without imposing progressive discipline because it "was not one of the reasons alleged in Schneiter's termination letter." Schneiter does not support this argument with any legal authority, and we reject it on that basis. *See* *Pettit*, 171 Wis. 2d at 646.

denied due process because: (1) he did not have notice that Work Rule 25 applied to his conduct on social media; (2) the comment made by then-Lieutenant Governor Mandela Barnes on social media after the article was published improperly influenced the Department's investigation;[8] and (3) the hearing examiner was impermissibly biased. These arguments are without merit.

### A. Schneiter had notice that Work Rule 25 applied to his conduct on social media.

¶45     Schneiter argues that he did not have notice that his posts were grounds for discipline because he could not have guessed that Work Rule 25 applied to his conduct and because the Department did not have a social media policy in place at that time. Citing *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir. 2000), Schneiter contends that "[a]dequate notice of workplace rules is satisfied when the rules do not make employees guess at its meaning or application." Even assuming for purposes of this opinion that Schneiter accurately characterizes *Greer* and that we will consider *Greer* for its persuasive value, we reject Schneiter's argument because Work Rule 25 plainly applies to Schneiter's conduct.

¶46     As noted, Work Rule 25 prohibits state employees from "[e]ngaging in any outside activities … which may … impair the employee's ability to perform his/her duties as an employee of the state." Given this language and the nature of Schneiter's job duties as a deputy warden, Schneiter would not have been left guessing as to whether the rule applied to his conduct. Schneiter was a supervisor

---

[8] We are treating Schneiter's argument regarding the Barnes comment as a due process argument even though Schneiter does not label it as such. This is consistent with how the respondents treat this argument, which Schneiter does not contest in his reply brief.

at the Department, a large agency with a diverse workforce and inmate population. As deputy warden, it was Schneiter's job to serve as a role model for those he supervised and to implement the Department's discrimination and harassment policy. In light of Schneiter's job responsibilities, it should not have come as a surprise to Schneiter when the Department determined that widely sharing offensive memes on Facebook that denigrated Muslims impaired Schneiter's ability to perform his duties. Work Rule 25 gave Schneiter constitutionally adequate notice, and we reject Schneiter's arguments to the contrary. *See **Greer***, 212 F.3d at 366, 369-70, 372 (concluding that workplace rules against insubordination, harassment, and bringing the employer into disrepute gave the employee constitutionally sufficient notice that he could be disciplined for issuing a news release that "publicly excoriated [his supervisor] as a lesbian harboring 'radical agendas' and announced both [his supervisor and another employee] to be 'homosexual women' despite the fact that neither had publicly declared their sexual orientation").

¶47     Schneiter argues that the term "outside activity" does not reasonably encompass "social media use." Schneiter does not develop this argument, and we could reject it on that basis alone. *See **Clean Wis.***, 282 Wis. 2d 250, ¶180 n.40. However, we also reject Schneiter's interpretation of the phrase "outside activity," which is most naturally understood as referring to any activity that takes place outside of work hours, regardless of the means by which such activity occurs. Even though the Department did not have a policy specific to social media in place at that time, Schneiter offers no logical or coherent rationale for exempting social media use from "outside activity" under Work Rule 25. The fact that the Department's work rules do not explicitly state that they apply to employees' social media use does not mean that Schneiter did not have notice of as much.

23

¶48    Further, Schneiter argues that he did not have notice that his actions constituted misconduct because "throughout Schneiter's forty-two-year-long tenure at [the Department], he has used Facebook in the same manner and has never been subject to discipline before."  It is unclear what Schneiter means in saying that he used Facebook "in the same manner" for forty-two years.  However, to the extent he suggests he may have previously posted discriminatory and offensive content on Facebook, that would not shield him from discipline for the conduct here or compel the conclusion that he did not have adequate notice that his actions constituted misconduct.[9]

*B. Substantial evidence supports the Commission's finding that the Department's decision to discharge Schneiter was not improperly influenced by Barnes' comment.*

¶49    As stated, after the article in the *Milwaukee Journal Sentinel* was published, then-Lieutenant Governor Mandela Barnes posted on social media that Schneiter was "the one that has to be taken out.  Too much of our nation's system of corrections is based on dehumanization.  To add bigotry to the mix is dangerous and cannot be tolerated."  Schneiter argues that Barnes' statement improperly influenced the Department's decision to discharge Schneiter.

---

[9] Schneiter also portrays the Commission's determination that he had adequate notice as resting upon the conclusory statement that it was "self-evident" that his actions constituted misconduct, and Schneiter argues that "[s]elf-evidence does not suffice as notice."  However, this argument mischaracterizes the Commission's reasoning, and we reject it on that basis.  The Commission did not simply state that it was "self-evident" that Schneiter had adequate notice and leave it at that; rather, the Commission stated "that it would be self-evident to any reasonable [Department] employee (particularly a high-ranking [Department] employee) that posting memes offensive to the Muslim community was misconduct—particularly in the context of the diverse [Department] workforce and prison community."  The Commission then quoted Work Rule 25, which it stated Schneiter was aware of.

¶50      This same argument was addressed and rejected by the Commission: the Commission determined that the Department "presented credible testimony that the Barnes comment did not influence the investigation or the discharge decision and thus the Commission rejects this allegation."  Although Schneiter argues that this "finding is contrary to the evidence submitted in the record," we reject this argument, which Schneiter fails to support and which does not account for our standard of review.

¶51      First, Schneiter does not identify any evidence (aside from Barnes' comment itself) to support his argument that the comment improperly influenced the Department's investigation.[10]  In fact, the evidence was to the contrary: Fessahaye was asked at the hearing, "Did Mandela Barnes have any influence over the Department['s] … decision to terminate Mr. Schneiter?" and Fessahaye responded, "No, he did not."  Similarly, Troy Enger—who was a regional chief with the Division of Community Corrections at the Department, and who was one of the investigators for the Department's investigation into Schneiter's conduct— testified that no one from the Department had brought any information regarding Barnes to his attention and that he was not pressured to find that Schneiter had violated any work rules.

---

[10]  We observe that in Schneiter's factual background section, he states, "The Secretary's Office's goal was to have its disciplinary decision align with the Lieutenant Governor's public statement that Schneiter 'had to go.'"  Schneiter provides a citation in support of this proposition, but the citation is to a nonexistent page in a particular document in the record.  We need not address arguments that are not supported by citations to the record, and we remind counsel that the rules of appellate procedure require parties to include appropriate citations to the record, not only in their statement of facts, but also in their argument.  *See* ***Tam v. Luk***, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990); WIS. STAT. RULE 809.19(1)(d)-(e).

¶52 In light of Schneiter's failure to identify supporting evidence and Fessahaye's and Enger's testimony to the contrary, Schneiter's argument fails, particularly given our standard of review. "Importantly, we uphold an agency's findings of fact unless a reasonable mind could not reach the conclusion that the agency reached," and, as stated, "we defer to the agency as to issues of credibility and the weight of the evidence." *Leach*, 414 Wis. 2d 465, ¶63; *see also Robles*, 394 Wis. 2d 761, ¶8 (stating that we search the record for evidence supporting the agency's factual determinations, "not … for evidence against them"). The Commission found that the testimony presented by the Department regarding Barnes' comment was credible, and given this testimony, a reasonable mind could determine that Barnes' comment did not improperly influence the Department's investigation.

### C. Schneiter has failed to show that the hearing examiner was biased.

¶53 "A basic element of due process is the right to a fair hearing conducted before a fair tribunal." *County of Dane v. PSC*, 2022 WI 61, ¶42, 403 Wis. 2d 306, 976 N.W.2d 790; *see also id.* ("Due process applies to proceedings before administrative entities."). "[A]dministrative decision-makers are entitled to [a] presumption of 'honesty and integrity' when serving as adjudicators." *Id.*, ¶45 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). To overcome this presumption, "the party asserting bias of an administrative adjudicator must show a 'serious risk of actual bias—based on objective and reasonable perceptions.'" *County of Dane*, 403 Wis. 2d 306, ¶45 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009)).

¶54 Schneiter argues that the hearing examiner was biased. The respondents counter that Schneiter forfeited this argument by failing to raise it

26

during the administrative proceedings. *See Bunker v. LIRC*, 2002 WI App 216, ¶15, 257 Wis. 2d 255, 650 N.W.2d 864 ("[T]o preserve an issue for judicial review, a party must raise it before the administrative agency."). Schneiter does not respond to this argument, thereby conceding that he forfeited his argument regarding bias. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 108-09, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments are deemed conceded); *United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (failure by appellant to respond in reply brief to an argument made in respondent's brief may be taken as a concession).

¶55   The respondents also correctly point out that although the hearing examiner prepared a proposed decision, the Commission was the ultimate decisionmaker, and it is the Commission's decision that we are reviewing on appeal.[11]   *See* WIS. STAT. § 227.46(2) (stating that an agency *may* adopt a hearing examiner's proposed decision as the final decision in the case); *Town of Holland v. PSC*, 2018 WI App 38, ¶21, 382 Wis. 2d 799, 913 N.W.2d 914 ("Judicial review of a decision by an administrative agency requires that this court review the decision of the agency …."); *see also Sierra Club v. DNR*, 2007 WI App 181, ¶13, 304 Wis. 2d 614, 736 N.W.2d 918 (explaining that judicial review under WIS. STAT. § 227.52 is limited to final agency decisions).  Here again, Schneiter fails to respond to this argument, thereby conceding that any claimed bias of the hearing examiner is inconsequential because the hearing examiner was not the ultimate decisionmaker.  *See Charolais Breeding Ranches*, 90 Wis. 2d at 108-09; *United*

---

[11] The respondents further note that the hearing examiner, while making the statement that Schneiter argues shows bias, began by stating, "I can't speak for Chairman Daley, who is the ultimate decision maker."

*Coop.*, 304 Wis. 2d 750, ¶39. Further, the cases that Schneiter cites in support of his argument that his due process rights were violated because the hearing examiner was biased all address bias of the actual decisionmaker, and Schneiter thus fails to provide authority supporting his argument. *See Pettit*, 171 Wis. 2d 627, 646. Accordingly, we reject Schneiter's argument that the hearing examiner was biased.

## CONCLUSION

¶56 In sum, Schneiter has not shown that he was denied due process: Work Rule 25 provided adequate notice that his conduct would subject him to discipline; substantial evidence supports the Commission's finding that the Barnes comment did not improperly influence the Department's investigation; and Schneiter has not shown that the hearing examiner was biased.

¶57 For the reasons stated above, we affirm.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.